IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| RANDY JENKINS, | ) | CV. NO. 5:12-CV-787-DAE |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF SAN ANTONIO FIRE | ) | |
| DEPARTMENT, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On April 7, 2014, the Court held a hearing on a Motion for Summary Judgment filed by Defendant City of San Antonio Fire Department ("Defendant" or "SAFD") ("Mot.," Dkt. # 29). Chris Pittard, Esq., represented Plaintiff Randy Jenkins ("Plaintiff" or "Jenkins"); Mark Kosanovich, Esq., represented Defendant. After careful consideration of the memoranda in support of and in opposition to the Motion, and in light of the parties' arguments at the hearing, the Court, for the reasons that follow, **GRANTS** Defendant's Motion for Summary Judgment.

BACKGROUND

I.      Factual Background

SAFD is a department of the City of San Antonio. The hierarchy of

1

SAFD, in descending order, is: Fire Chief, Deputy Chief, Assistant Chief, District Chief, Captain, Lieutenant, Engineer and Firefighter.  SAFD is overseen by Fire Chief Charles N. Hood ("Chief Hood"), a fifty-four-year-old African-American male.[1]  ("Hood Aff.," Dkt. # 29, Ex. A at 1.)

SAFD is comprised of several divisions, including the Fire Marshal Division (also referred to as the Fire Prevention Division).  ("Hitzfelder Dep.," Dkt. # 29, Ex. B at 1.)  From 2007 through his retirement on December 5, 2011, the Fire Marshal Division fell under the authority of Deputy Chief Rodney Hitzfelder ("Hitzfelder").  (Id.)

Since July 31, 2007, Assistant Chief Earl Crayton ("Asst. Chief Crayton"), a 63-year-old African-American male, has been the direct supervisor of the Fire Marshal Division.  ("Crayton Dep.," Dkt. # 29, Ex. C, 6:10–7:25, Oct. 4, 2013; see also "Crayton Aff.," Dkt. # 29, Ex. D at 1.)  He also holds the title of Fire Marshal.  (Crayton Dep. 7:1–12.)

Plaintiff Randy Jenkins is a fifty-one-year-old African-American male who has been employed by Defendant San Antonio Fire Department since March 1986.  ("FAC," First Amended Complaint, Dkt. # 23 at 2; "Jenkins Dep.," Dkt. # 36, Ex. 1, 78:19–21, Apr. 4, 2013.)  In 1989, he was promoted to Engineer; in 1993, he

---

[1] Because of the nature of the allegations in this case, the Court notes that the racial background of individuals is relevant.

2

was promoted to Lieutenant; in 1995, he was promoted to Captain.  (Jenkins Dep. 78:16–79:16.)  In 1998, he was promoted to District/Division Chief, and has since retained that title.  (Id. 79:17–25.)

Beginning early 2008, Plaintiff was assigned to the Fire Marshal's Office and held the position of District/Division Chief of Fire Prevention.  (Id. 93:1–5, 96.)  In this capacity, he was responsible for overseeing Community Safety and Education.  (Id. 93–96.)  He supervised two individuals: a Lieutenant and an Engineer, as well as several light-duty staff.  (Id. 97:3–13.)  Another District/Division Chief, Arthur Villareal ("Villareal"), was already working in the Fire Prevention Division and oversaw Arson, Special events, Inspections, and Administration.  (Id. 93:1–5.)  Both individuals were supervised by Asst. Chief Crayton.  (Id. 94:3–23, 98:4–11.)

After Villareal left the Fire Marshal's Office in June 2008, Asst. Chief Crayton transferred all of the duties of the Fire Marshal's Office to Plaintiff, including Community Safety and Education, Arson, Special events, and Inspections.  (Id. 96–98.)  In this capacity, Plaintiff supervised five to six Captains.  (Id. 99–100.)

Sometime after 2008, Asst. Chief Crayton appointed another individual, District/Division Chief Armando Perez ("Perez") to the Fire Marshal's Office.  (Id. 100–01.)  Asst. Chief Crayton transferred Plaintiff's duties of Community Safety and Education to Perez, transferred Arson to himself, and

3

assigned Plaintiff to oversee Inspections, Administration and Special Events.  (Id. 102–03.)  In late 2010, however, Perez left the Fire Marshal's Office to transfer to Special Operations.  (Id. 107:11–16.)  Asst. Chief Crayton then assigned District/Division Chief Christopher Monestier ("Monestier") to Community Safety and Education, as well as Special Events.  (Id. 107–08.)  Plaintiff continued to oversee Administration and Inspections (Id. 110:11–14.)  Both Monestier and Plaintiff supervised approximately ten to twelve individuals in their respective positions.  (Id. 110:15–25.)

On February 3, 2011, Asst. Chief Crayton realigned the duties of Monestier and Plaintiff.  (Id. 111–12.)  Plaintiff was given responsibility for oversight of Community Safety and Education, and Monestier was given responsibility for the oversight of Inspections and Special Events.  (Id.; see also Crayton Dep. 21:18–23:5.)

In mid-2012, Monestier left the Fire Marshal's Office.  (Jenkins Dep. 188:15–20.)  Plaintiff asked to be reassigned to supervise Inspections.  (Crayton Dep. 66:12–16.)  Asst. Chief Crayton felt that Plaintiff had not shown any significant improvement in his work performance to warrant overseeing the Inspections duties, so he decided to open up the position to any interested District/Division Chief.  (Id. 67:17–23.)  The position was advertised throughout SAFD and a review panel for the position was selected.  (Id. 73:17–24.)

4

The interview panel included three individuals: Terry Kannawin ("Kannawin"), a director in the City's Department of Development Services; Chief Horan ("Horan"), the Chief of Operations for SAFD; and Janae Florance ("Florance"), a deputy chief in SAFD.  (Id. 74:22–75:17; Dkt. # 29, Exs. F, G, H.) Kannawin and Horan are Caucasian; Florance is African-American.  (Crayton Dep. 75:23–76:4; Dkt. # 29, Exs. F, G, H.)  SAFD Human Resources drafted questions for the review panel.  (Crayton Dep. 74:12–17.)

The only two candidates to apply for the District/Division Chief position overseeing Inspections were Plaintiff and District/Division Chief Matias Jiminez ("Jiminez").  (Id. 85:5–8.)  Jiminez is a Hispanic male, who is two years younger than Plaintiff.  (Id. 85:1–10; see also Crayton Aff. at 3 ("I have reviewed the City's TLETS records for both Chief Jenkins and Chief Jiminez that show their dates of birth.  Chief Jenkins' date of birth is February 17, 1960.  Chief Jiminez's date of birth is January 25, 1962.").)  After the interviews were conducted by the panel, the panel recommended to Chief Hood that Jiminez be selected over Plaintiff. (See Dkt. # 29, Exs. F, G, H.)  Jiminez was placed in the Fire Marshal's Office on May 15, 2012 and was in charge of overseeing Inspections, Administration, and Special Events.  (Crayton Aff. at 3.)  Plaintiff retained responsibility for Community Safety and Education.  (Id.)

On May 16, 2013, Asst. Chief Crayton again realigned the duties in the

Fire Marshal's Office to balance workloads.  (Id.)  Oversight for boarding homes,

schools, hospitals, nursing homes, and congregate living, which had previously been

part of the Inspections duties, was carved out and assigned to Plaintiff.  (Id.)

Plaintiff was also given responsibility for overseeing Special Events, HazMat, after-

hours details, and supervision of all engineers assigned to the Fire Marshal's Office,

as well as his continued oversight of Community Safety and Education.  (Id.)

Jiminez was responsible for the balance of Inspections duties, office administration

and fire code interpretation, the latter of which had not previously been a division

chief assignment.  (Id.)

II.    Procedural Background

On August 19, 2011, Plaintiff filed a complaint with the Equal

Employment Opportunity Commission ("EEOC"), alleging discrimination based on

race, color, and age, as well as retaliation.  (Dkt. # 36, Ex. 1-1.)  In his Charge of

Discrimination, Plaintiff contended that over a year-and-a-half earlier, Asst. Chief

Crayton had made comments about Plaintiff's having given a statement supporting a

complaint filed against Asst. Chief Crayton.  (Id.)  He also claimed that the February

2011 reassignment of duties with Monestier was a demotion.  (Id.)

On August 17, 2012, nearly a year later, Plaintiff filed a second Charge

of Discrimination with the EEOC, alleging that his non-selection to be the district

chief supervising Inspections was based on discriminatory motives and retaliation.

(Dkt. # 36, Ex. 1-2.)

Three days later on August 20, 2012, Plaintiff filed suit in this Court, alleging that the reassignment of duties in February 2011 was based on age and race discrimination because he was replaced by Monestier, a younger, Caucasian, less-experienced District/Division Chief.  (Dkt. # 1.)  Plaintiff again contended that his reassignment to Community Safety and Education was, in effect, a "demotion" because it resulted in a loss of prestige and overtime pay.  (Id. ¶ 8.)  Plaintiff also included a retaliation claim, alleging that Asst. Chief Crayton made the alleged "demotion" because he had previously made comments to Plaintiff, including "He knew Plaintiff had given testimony against him in a fellow fireman's complaint" and that Asst. Chief Crayton was "keeping records" on Plaintiff.  (Id. ¶ 7.)

He amended his complaint on June 26, 2013, to include the claims raised in his second EEOC Charge of Discrimination relating to the 2012 selection process for District/Division Chief of Inspections.  (FAC ¶ 8.)  He asserted that SAFD engaged in intentional race and age discrimination by selecting Jiminez, a younger, less-qualified Hispanic male, to oversee the Inspections duties.  (Id.)  He also amended his retaliation claim to allege that SAFD retaliated against him by choosing Jiminez because of Plaintiff's first EEOC Charge of Discrimination.  (Id.)

On October 18, 2013, Defendant filed a Motion for Summary Judgment that is now currently before the Court.  On November 5, 2013, Plaintiff filed a

Response ("Response").  ("Resp.," Dkt. # 34.)  Defendant filed a Reply on

November 19, 2013.  ("Reply," Dkt. # 41.)  On that same day, Defendant filed a

Miscellaneous Objection to Plaintiff's evidence tendered in his Response.  (Dkt.

# 42.)

<u>LEGAL STANDARD</u>

Summary judgment is granted under Federal Rule of Civil Procedure

56 when "the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

<u>see also</u> <u>Cannata v. Catholic Diocese of Austin</u>, 700 F.3d 169, 172 (5th Cir. 2012).

"In an employment discrimination case, we focus on whether a genuine issue exists

as to whether the defendant intentionally discriminated against the plaintiff."

<u>Grimes v. Tex. Dep't of Mental Health & Mental Retardation</u>, 102 F.3d 137, 139

(5th Cir. 1996).

The moving party bears the initial burden of demonstrating the absence

of any genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323

(1986).  If the moving party meets this burden, the non-moving party must come

forward with specific facts that establish the existence of a genuine issue for trial.

<u>ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.</u>, 699 F.3d 832, 839 (5th

Cir. 2012).  "Where the record taken as a whole could not lead a rational trier of fact

to find for the non-moving party, there is no 'genuine issue for trial.'"  <u>Matsushita</u>

Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting

First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

        In deciding whether a fact issue has been created, "the court must draw

all reasonable inferences in favor of the nonmoving party, and it may not make

credibility determinations or weigh the evidence."  Reeves v. Sanderson Plumbing

Prods., Inc., 530 U.S. 133, 150 (2000).  However, "[u]nsubstantiated assertions,

improbable inferences, and unsupported speculation are not sufficient to defeat a

motion for summary judgment."  Brown v. City of Hous., 337 F.3d 539, 541 (5th

Cir. 2003); Douglass v. United Servs. Automobile Assoc., 79 F.3d 1415, 1429 (5th

Cir. 1996) (en banc) ("[C]onclusory allegations, speculation, and unsubstantiated

assertions are inadequate to satisfy the nonmovant's burden.").  "In response to

motions for summary judgment, it is therefore incumbent upon the non-moving

party to present evidence—not just conjecture and speculation—that the defendant

retaliated and discriminated against plaintiff on the basis of [his or] her race."

Grimes, 102 F.3d at 140.

## DISCUSSION

        The claims asserted in Plaintiff's First Amended Complaint involve

two specific instances that he alleges resulted from race and age discrimination as

well as retaliation: (1) the 2011 reassignment wherein Monestier took over the

Inspections position and Plaintiff was reassigned the position of Community Safety

9

and Education (the "2011 reassignment"), and (2) the 2012 selection process

wherein Jiminez was selected for the Inspections position over Plaintiff (the "2012

selection process").

I.      The 2011 Reassignment

        A.      Plaintiff's Race and Age Discrimination Claims and Retaliation Claims
                are Barred Because They Were Untimely Filed.

                Defendant first argues that it is entitled to summary judgment because

Plaintiff's claims of race and age discrimination and retaliation concerning the 2011

reassignment to Community Safety and Education addressed in EEOC Complaint

451-2011-01816 are time barred.  Defendant asserts that the EEOC issued its right-

to-sue letter on May 16, 2012 and Plaintiff filed suit in this Court on August 16,

2012—six days outside the requisite ninety-day window.  (Mot. at 6–7.)  Plaintiff

counters that the Fifth Circuit allows for a three-to-seven-day window for receiving

a right-to-sue letter and this window therefore makes Plaintiff's Complaint timely.

(Resp. at 20–21.)

                Before pursuing claims in federal court, a plaintiff claiming

employment discrimination must exhaust his or her administrative remedies.

Hampton v. IRS, 913 F.2d 180, 182 (5th Cir. 1990).  A plaintiff has exhausted his or

her administrative remedies if he or she filed a timely charge with the EEOC and

receives a statutory notice of right to sue ("right-to-sue letter").  Taylor v. Books A

Million, Inc., 296 F.3d 376, 378–79 (5th Cir. 2002) (citing Dao v. Auchan Hypermarket, 96 F.3d 787, 788–89 (5th Cir. 1996)).

    After receipt of a right-to-sue letter, a plaintiff has ninety days to file a civil action.  42 U.S.C. § 2000e-5(f)(1); Taylor, 296 F.3d at 379 ("Title VII provides that claimants have ninety days to file a civil action after receipt of such a notice from the EEOC." (citing Nilsen v. City of Moss Point, Miss., 674 F.2d 379, 381 (5th Cir. 1982))); see also Bunch v. Bullard, 795 F.2d 384, 387–88 (5th Cir. 1986) (holding that the ninety-day period within which a plaintiff has to file a claim against an employer begins to run, not when the right-to-sue letter is issued by the EEOC, but when the plaintiff received the letter).  From the date of receipt, the ninety-day requirement is "strictly construed."  Taylor, 296 F.3d at 379.

    In this case, the EEOC issued its right-to-sue letter on May 16, 2012 (Dkt. # 36, Ex. 1-3); however, Plaintiff could not identify the date he received the right-to-sue letter from the EEOC (Jenkins Dep. 86:15–17, 87:19–91:12).  When the date of receipt is unknown, courts can presume that a plaintiff received the right-to-sue letter within a certain period of days.  The Fifth Circuit has addressed this presumption in several cases.

    In Taylor, the Fifth Circuit considered when the ninety-day limitations period began to run when a plaintiff fails to state a specific date upon which he or she received the right-to-sue letter.  296 F.3d at 376.  Recognizing that the issue was

11

"a matter of first impression" in the Fifth Circuit, the court looked to other federal

courts for direction:

> When the date on which a right-to-sue letter was actually received is either unknown or disputed, courts have presumed various receipt dates ranging from three to seven days after the letter was mailed.  See Lozano v. Ashcroft, 258 F.3d 1160, 1164 (10th Cir. 2001); see also Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 148 n.1 (1984) (presuming the plaintiff received a right-to-sue letter three days after delivery based upon Fed. R. Civ. P. 6(e)); Banks v. Rockwell Intern. N. Am. Aircraft Operations, 855 F.2d 324, 326 (6th Cir. 1988) (applying a five-day presumption of receipt of a right-to-sue letter).

Id.  However, the Taylor court held that even under the longer seven-day

presumption of receipt, the plaintiff's Title VII claims would be time-barred because

she filed eight days after the right-to-sue letter was issued.  Id.

One year later, in Martin v. Alamo Community College District, the

Fifth Circuit noted that the presumptive time period is three days.  353 F.3d 409,

411 (5th Cir. 2003).  There, the EEOC mailed the plaintiff's right-to-sue letter on

September 17, 1999.  Id.  The court "presumed" that the plaintiff received this letter

three days later, on September 20, 1999.  Id. ("We will presume that Martin received

this letter three days later, on September 20, 1999." (citing Baldwin Cnty. Welcome

Ctr. v. Brown, 466 U.S. 147, 148 n.1 (1984); Taylor, 296 F.3d at 379–80)).  Thus,

the court held, that because the plaintiff filed her suit on December 17, 1999—

eighty-eight days later—"her lawsuit was timely."  Id.

However, in a series of unpublished decisions, the Fifth Circuit revived

12

<u>Taylor</u>'s three-to-seven-day dicta.  <u>See</u> <u>Stokes v. Dolgencorp., Inc.</u>, 367 F. App'x
545, 547–48 (5th Cir. 2010) ("When the plaintiff does not assert that she received
her notice on a specific date, we may presume that she received it between three and
seven days after it was mailed." (citing <u>Taylor</u>, 296 F.3d at 379)); <u>Washington v.</u>
<u>City of Gulfmort, Miss.</u>, 351 F. App'x 916, 918 (5th Cir. 2009) ("In [<u>Taylor</u>], this
court held that in determining a date for presumption of receipt we should use a
range of three to seven days after mailing." (citing <u>Taylor</u>, 296 F.3d at 379));
<u>Bowers v. Potter</u>, 113 F. App'x 610, 612–13 (5th Cir. 2004) ("[W]hen the date that
the letter is actually received is unknown or is in dispute, we will, like other courts,
presume that the letter was received within three to seven days after it was mailed
by the OFO, unless the plaintiff, through no fault of [his or] her own, failed to
receive the letter, or the plaintiff presents some other equitable reason for tolling the
statute." (citing <u>Taylor</u>, 296 F.3d at 379)).

   Although each of the unpublished decisions expressed satisfaction with
the three-to-seven-day presumption of receipt, none of the opinions decided the
exact number of days necessary because each of the plaintiffs' suits were untimely
even under the seven-day, extra-lenient presumption.  <u>See</u> <u>Stokes</u>, 367 F.3d at 545
(holding that even under the seven-day presumption, the plaintiff's complaint was
untimely because it was filed more than ninety days later); <u>Washington</u>, 351 F.
App'x at 918 (finding that even under the seven-day presumption, the plaintiff's

claim was time barred because he filed suit 104 days later); Bowers, 113 F. App'x at 613 (dismissing the plaintiff's action because after applying even the longest presumption for day of receipt, the plaintiff filed ten days too late).

In Morgan v. Potter, the Fifth Circuit recognized that its case law had never firmly decided the exact number of days for the presumption of receipt of a right-to-sue letter:

> Since Taylor, we have repeatedly handled cases like this one without selecting a fixed number of days. See Martin v. Alamo Comm. Coll. Dist., 353 F.3d 409, 411 (5th Cir. 2003) (presuming that plaintiff had received letter in three days, but not discussing issue); Bowers v. Potter, 113 Fed. Appx. 610, 612–13 (5th Cir. 2004) (unpublished opinion) (reiterating view that presumption of between three and seven days was appropriate, but not deciding issue further because suit was untimely under most lenient presumption). The exact number of days is thus an open question in this Circuit, but we have expressed satisfaction with a range between three and seven days. Bowers, 113 Fed. Appx. at 612.

489 F.3d 195, 196 (5th Cir. 2007) (emphasis added). There, an OFO letter stated that it presumed the plaintiff received the letter five days after it was mailed. Id. Noting that because Fifth Circuit case law "d[id] not clearly resolve this case," the court agreed with the district court that the five-day presumption as provided for in the letter was reasonable and thus, the plaintiff's suit was untimely by two days. Id. at 196–97.

For the reasons that follow, the Court holds that the three-day presumption for receipt of a right-to-sue letter is appropriate given the wealth of

authority, both in and outside of the Fifth Circuit, adopting a period of three days.

First, the Court notes even though the <u>Morgan</u> court questioned

<u>Martin</u>'s three-day presumption, because <u>Martin</u> did not discuss its rationale for

applying such a rule, district courts within the Fifth Circuit have adhered to <u>Martin</u>'s

three-day presumption for receipt of right-to-sue letters.  See <u>Smith v. Dallas Cnty.</u>

<u>Hosp. Dist.</u>, 3:13-CV-0792-G BN, 2014 WL 645248, at *3 (N.D. Tex. Feb. 19,

2014) ("Because Plaintiff failed to allege the specific date on which she actually

received the right-to-sue letter and the date the letter was received is unknown, the

undersigned concludes that a presumption of receipt within three days of issuance is

appropriate."); <u>Dorest v. Piney Point Surgical Ctr.</u>, 4:10-CV-03908, 2011 WL

2633575, at *2 (S.D. Tex. July 5, 2011) ("In the Fifth Circuit, there is a presumption

that a party receives the right-to-sue notice three days after it is mailed."); <u>Crabtree</u>

<u>v. Cyberonics, Inc.</u>, CIV.A. H-05-4221, 2006 WL 1581971, at *2 (S.D. Tex. June 7,

2006) (citing <u>Martin</u> and following three-day presumption for receipt of right-to-sue

notice); <u>DeJesus-Harris v. Blockbuster Video</u>, CIVA SA04-CA-1099XR, 2006 WL

2620510, at *5 (W.D. Tex. Sept. 5, 2006) (acknowledging <u>Martin</u>'s three-day

presumption, but declining to follow it because the actual date of receipt was known

and not disputed); <u>Aportela v. Barnhart</u>, EP-03-CA-0360-DB, 2005 WL 1958963, at

*11 (W.D. Tex. Aug. 15, 2005) (following <u>Martin</u>'s three-day presumption and

holding that "[t]he complaint . . . must be filed ninety-three (93) days after the right-

to-sue letter is mailed").

Second, the majority of persuasive authority holds that the presumption of receipt is three days. In <u>Payan v. Aramark Management Services Ltd. Partnership</u>, the Ninth Circuit adopted the three-day presumption. 495 F.3d 1119 (9th Cir. 2007). The court first reasoned, "The three-day presumption accords with Federal Rule of Civil Procedure 6(e), which provides that "[w]henever a party must or may act within a prescribed period after service and service is made [by mail], 3 days are added after the prescribed period would otherwise expire." <u>Id.</u> at 1125–26 (citing Fed. R. Civ. P. 6(e); <u>Baldwin</u>, 466 U.S. at 148 n.1 (relying on Rule 6(e)); <u>Seitzinger v. Reading Hosp. and Med. Ctr.</u>, 165 F.3d 236, 239 (3d Cir. 1999) (same)). The court followed Rule 6(e) because that "rule is well-known, and is reasonable in this context as in other aspects of civil litigation." <u>Id.</u> at 1126. The court rejected the five-day presumption because the five-day rule

> has been explained as according with 20 C.F.R. § 422.210(c) (provision of Social Security Act presuming receipt of notice five days after the date of a denial or a decision), <u>see</u> <u>Hunter v. Stephenson Roofing, Inc.</u>, 790 F.2d 472, 475 (6th Cir. 1986), and alternatively, as an additional two-day allotment beyond the mailing time allowed in Rule 6(e), <u>see</u> <u>Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.</u>, 209 F.3d 552, 557 n.9 (6th Cir. 2000) (referring to <u>Baldwin</u>, 466 U.S. at 148 n.1). We see no basis for adopting such a presumption in this context.

<u>Id.</u> The court likewise rejected the seven-day rule because the court could not find any "articulated reason for allowing seven days after mailing." <u>Id.</u> Relying on "the

16

Supreme Court's use of the three-day presumption in <u>Baldwin</u>, its adoption by an

overwhelming number of circuits, and its basis in Federal Rule of Civil Procedure

6(e)," the court concluded by adopting "the three-day presumption as the governing

standard for this circuit."  <u>Id.</u>

   As the Ninth Circuit noted, nearly all of the circuit courts follow the

three-day presumption for receipt of right-to-sue letters.  <u>See</u> <u>Abraham v. Woods</u>

<u>Hole Oceanographic Institute</u>, 553 F.2d 114, 121 n.10 (1st Cir. 2009) (applying

three-day presumption for receipt of right-to-sue letter); <u>Kerr v. McDonald's Corp.</u>,

427 F.3d 947, 953 (11th Cir. 2005) ("When the date of receipt is in dispute, this

court has applied a presumption of three days for receipt by mail, akin to the time

period established in Fed. R. Civ. P. 6(e)."); <u>Seitzinger v.Reading Hosp. & Med.</u>

<u>Ctr.</u>, 165 F.3d 236, 239 (3d Cir. 1999) ("[I]n the absence of other evidence, courts

will presume that a plaintiff received her right-to-sue letter three days after the

EEOC mailed it." (citing Fed. R. Civ. P. 6(e))); <u>Nguyen v. Inova Alexandria Hosp.</u>,

187 F.3d 630 (4th Cir. 1999) ("In this situation, the district court's application of the

presumption rule under Rule 6(e) was proper.  Applying the three day rule, the letter

is presumed to have been delivered to Nguyen on August 23, 1997, and the

limitations period expired ninety days later on November 21, 1997."); <u>Smith-Haynie</u>

<u>v. District of Columbia</u>, 155 F.3d 575, 578 n.3 (D.C. Cir. 1998) ("In the event that a

date is not pleaded, the Supreme Court has applied the '3-day' rule of Fed. R. Civ.

P. 6(e) to presume that the letter is received three days after it is mailed."); <u>Sherlock v. Montefiore Med. Ctr.</u>, 84 F.3d 522, 525–26 (2d Cir. 1996) ("Normally it is assumed that a mailed document is received three days after its mailing." (citing <u>Baldwin</u>, 466 U.S. at 148 n.1)).

In fact, the only circuit court that adheres to the five-day rule is the Sixth Circuit.  <u>See</u> <u>Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.</u>, 209 F.3d 552, 557 n.9 (6th Cir. 2000) ("The Sixth Circuit allots two days for postal delivery of a RTS notice beyond the three day period allowed by Federal Rule of Civil Procedure 6(e).").  The Seventh Circuit requires actual notice, so the presumption is unnecessary.  <u>See</u> <u>Houston v. Sidley & Austin</u>, 185 F.3d 837 (7th Cir. 1999) ("[The] 90-day period begins to run when the claimant receives actual notice of her right to sue.").

The Court has searched in vain for any circuit that has adopted a seven-day presumption.  Indeed, it appears that the seven-day presumption rests on shaky ground.  Although <u>Taylor</u> indicated that a seven-day presumption would be satisfactory, the Tenth Circuit decision cited by <u>Taylor</u> for such a proposition, <u>Lozano v. Ashcroft</u>, 258 F.3d 1160, 1164–65 (10th Cir. 2001), is devoid of any citation or reliance on the seven-day rule.  Admittedly, <u>Lozano</u> does state, "When the receipt date for an EEOC right-to-sue letter is unknown or disputed, federal courts have presumed various receipt dates ranging from three to seven days after

18

the letter was mailed." Id. at 1164.  But then the court provides a string citation to

several cases—none of which adopt or authorize the seven-day rule:

> See, e.g., Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 148
> n.1, (1984) (presuming receipt three days after delivery based upon
> Fed. R. Civ. P. 6(e)); Seitzinger v. Reading Hosp. & Med. Ctr., 165
> F.3d 236, 239 (3d Cir. 1999) (same); Sherlock v. Montefiore Medical
> Ctr., 84 F.3d 522, 525–26 (2d Cir. 1996) (finding three-day
> presumption rebutted); Hunter v. Stephenson Roofing, Inc., 790 F.2d
> 472, 475 (6th Cir. 1986) (applying five-day presumption for social
> security right-to-sue letter, based upon 20 C.F.R. § 422.210(c) (1985)).
> See also Rao v. Baker, 898 F.2d 191, 195–96 (D.C. Cir. 1990)
> (explaining EEOC interprets "receipt . . . of final decision" to include
> "a rebuttable presumption that in all cases in which evidence of the
> actual date of receipt is lacking, the final agency decision will be
> deemed to have been received [five] days following the date of
> decision") (citing 44 Fed. Reg. 34,494 (1979)) (internal quotations and
> marks omitted).

Id. at 1164–65.

Moreover, the three-day period, analogous to the federal rule governing

time for taking action after service by mail, see Fed. R. Civ. P. 6(e), "also provides a

clear rule that will enable parties to be aware of when they must act or forfeit their

right to sue."  Zillyette v. Capital One Fin. Corp., 179 F.3d 1337, 1342 (11th Cir.

1999).

In any event, the three-day rule is not unreasonably harsh; any

hardships to plaintiffs can be accommodated by equitable tolling rules—not the

presumptive-receipt rule.  See Harris v. Boyd Tunica, Inc., 628 F.3d 237, 239 (5th

Cir. 2010) (reminding that because the ninety-day filing requirement is not a

jurisdictional prerequisite, it is subject to equitable tolling); <u>Zillyette</u>, 179 F.3d at 1342 (reminding that although a plaintiff is entitled to a reasonable time to pick up an EEOC right-to-sue letter upon receipt of notice of delivery, the three-day period, analogous to federal rule governing time for taking action after service by mail, provides a clear and appropriate period for a plaintiff to act to receive an unsuccessfully delivered letter and that any other hardships to plaintiff can be accommodated by the equitable tolling rules).  Likewise, the three-day presumption for mailing is a rebuttable presumption.  "If a claimant presents sworn testimony or other admissible evidence from which it could reasonably be inferred either that the notice was mailed later than its typewritten date or that it took longer than three days to reach her by mail, the initial presumption is not dispositive."  <u>Sherlock</u>, 84 F.3d at 526; <u>accord</u> <u>DeJesus-Harris</u>, 2006 WL 2620510, at *6–7 (finding the plaintiff's complaint timely because the plaintiff tendered evidence that she received her right-to-sue letter six days after the EEOC mailed the letter, and therefore <u>Martin</u>'s three-day presumption did not apply).  In this case, Plaintiff does not argue that his delay is subject to equitable tolling nor does he allege that he actually received his right-to-sue letter past the three-day presumption.

Given that Plaintiff in this case has not tendered any evidence to mitigate the three-day presumption and there is overwhelming support for applying the legal presumption that a right-to-sue letter was received three days after mailing,

the Court will presume that Plaintiff received his right-to-sue letter three days after

issuance—May 19, 2012.  Thus, Plaintiff was required to file his complaint ninety

days after the EEOC issued its right-to-sue letter—August 17, 2012.  Plaintiff's

complaint was filed August 20, 2012, which was three days late.  The ninety-day

deadline is "strictly construed" in the Fifth Circuit, see Taylor, 296 F.3d at 379;

therefore, Defendant is entitled to summary judgment on Plaintiff's race and age

discrimination and retaliation claims addressed in EEOC Complaint 451-2011-

01816 regarding his 2011 reassignment because the claims are time barred.

B.     Plaintiff Cannot State a Prima Facie Case for the 2011 Reassignment
       for his Race and Age Discrimination Claims.

Even assuming that Plaintiff timely filed his complaint, Plaintiff fails to

state a prima facie case for race and age discrimination because he has not produced

enough evidence to demonstrate that the 2011 reassignment from his Inspections

position to Community Safety and Education was an adverse employment action.

Title VII prohibits an employer from discriminating against an

employee because of the "individual's race, color, religion, sex or national origin."

42 U.S.C. § 2000e-2(a).  Title VII intentional discrimination can be proven by either

direct or circumstantial evidence.  Jackson v. Watkins, 619 F.3d 463, 466 (5th Cir.

2010).  In order for evidence to be "direct," it must, if believed, prove the fact in

question without inference or presumption.  Fabela v. Socorro Indep. Sch. Dist., 329

F.3d 409, 415 (5th Cir. 2003).

In this case, Plaintiff does not have direct evidence of racial or age discrimination.  Accordingly, his claims of race and age discrimination are analyzed under the burden-shifting framework provided by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[2]   Abarca v. Metro. Transit Auth., 404 F.3d 938, 941 (5th Cir. 2005) (circumstantial evidence of racial discrimination analyzed under McDonnell Douglas burden-shifting framework); accord Jackson v. Cal Western Packaging Corp., 602 F.3d 374, 378 (5th Cir. 2010) (circumstantial evidence of age discrimination analyzed under McDonnell Douglas burden-shifting framework).

According to the McDonnell Douglas framework, a plaintiff must first establish a prima facie case of discrimination.  Id.  For a racial discrimination claim, a plaintiff must show he or she was: (1) a member of a protected class; (2) qualified for the position held; (3) subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or in the case of disparate treatment, treated differently from others similarly situated.  Id. (citing Rios v. Rossotti, 252 F.3d 375, 378 (5th Cir. 2001)).  For a prima facie case age discrimination claim generally, a plaintiff must show: (1) he is over forty years of age; (2) he is qualified for the position; (3) he was subjected to an adverse personnel

---

[2] Both parties agree that Plaintiff does not have direct evidence of intentional discrimination and acknowledge that the proper analysis involves the McDonnell Douglas burden-shifting framework.  (See Mot. at 8–9; Resp. at 4–5.)

action; and (4) he was replaced by someone younger, but not significantly younger, or treated less favourably than similarly situated younger employees.  Smith v. City of Jackson, Miss., 351 F.3d 183, 196 (5th Cir. 2003).

If a plaintiff successfully establishes a prima facie case, there is an inference of intentional discrimination.  McDonnell Douglas, 411 U.S. at 792.  The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Id. at 801–03; Rachid v. Jack in the Box, 376 F.3d 305, 312 (5th Cir. 2004).  If the defendant satisfies its burden of establishing a legitimate, non-discriminatory reason, which, if believed, would support a finding that the challenged action was non-discriminatory, the inference of discrimination raised by the plaintiff's prima facie case dissipates.  Grimes, 102 F.3d at 140.

For racial discrimination cases, the burden then shifts back to the plaintiff to create a genuine issue of material fact that the defendant's reason is not true, but is instead a pretext for discrimination.  Reeves, 530 U.S. at 141.[3]  For age discrimination cases, the burden shifts back to the plaintiff to create a genuine issue of material fact that age was the "but-for" cause of the challenged adverse

---

[3] Reeves also allows a plaintiff to show that race was "a motivating factor."  530 U.S. at 141.  Here, however, Plaintiff does not argue a "mixed-motives" theory and instead argues that Defendant's legitimate, non-discriminatory reasons were pretextual.  (See Resp. at 8–9.)

employment action.  <u>Gross v. FBL Fin. Servs., Inc.</u>, 557 U.S. 167, 175 (2009).

"But-for" cause means the cause without which the challenged adverse employment

action would not have occurred.  <u>See</u> <u>Long v. Eastfield Coll.</u>, 88 F.3d 300, 305 n.4

(5th Cir. 1996).

Throughout the burden-shifting analysis in the context of a motion for

summary judgment, the plaintiff bears the ultimate burden of showing a genuine

issue of material fact on whether the defendant intentionally discriminated against

him or her on the basis of race.  <u>Reeves</u>, 530 U.S. at 143.

Here, Defendant argues that Plaintiff cannot establish a prima facie

case of race and age discrimination because he was not the subject of an adverse

personnel action with respect to the February 2011 reassignment of duties.  (Mot. at

10.)[4]  Plaintiff counters that he suffered an adverse employment action when he was

"involuntarily transferred" from his duties overseeing Inspections and

Administration and "demoted" to supervising Community Safety and Education

because the latter position resulted in a "loss of prestige, responsibilities and

overtime opportunities."  (Resp. at 6–7.)

For all Title VII and ADEA claims, "adverse employment actions

include only ultimate employment decisions such as hiring, granting leave,

---

[4] Defendant does not dispute the remaining three elements of Plaintiff's prima facie
case for Plaintiff's race and age discrimination claims related to the 2011
reassignment.  (<u>See</u> Mot. at 10–15.)

discharging, promoting or compensating." McCoy v. City of Shreveport, 492 F.3d 551, 559 (5th Cir. 2007) (quoting Green v. Adm'rs of Tulane Educ. Fund, 284 F.3d 642, 657 (5th Cir. 2002)).

"[A] purely lateral transfer is not an adverse employment action." Burger v. Cent. Apartment Mgmt., Inc., 168 F.3d 875, 879 (5th Cir. 1999) (quoting Doe v. Delkab Cnty. Sch. Dist., 145 F.3d 1441, 1450 (11th Cir. 1998)); accord Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir. 1997). In Burger, the Fifth Circuit followed it sister circuits by quoting the following passage by Judge Posner:

> Obviously a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either. Otherwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit. The Equal Employment Opportunity Commission, already staggering under an avalanche of filings too heavy for it to cope with, would be crushed, and serious complaints would be lost among the trivial.

Id. (quoting Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996)).

However, a transfer may be considered a de facto demotion, which qualifies as an adverse employment action. Alvarado v. Tex. Rangers, 492 F.3d 605, 612 (5th Cir. 2007). "[T]o be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position

proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement." Id. (quoting Sharp v. City of Hous., 164 F.3d 923, 933 (5th Cir. 1999)); see also Serna v. City of San Antonio, 244 F.3d 479, 483 (5th Cir. 2001) ("A transfer, even without an accompanying cut in pay or other tangible benefits, may constitute an adverse employment action . . . .").

Whether the new position is "worse" is an objective inquiry. Alvarado, 492 F.3d at 613–14. "[A] plaintiff's subjective perception that a demotion has occurred is not enough." Id. (quoting Forsyth v. City of Dall., 91 F.3d 769, 774 (5th Cir. 1996)); see also Hunt v. Rapides Healthcare Sys., LLC, 277 F.3d 757, 771 n.8 (5th Cir. 2001) ("[T]he focus is on the objective qualities of the positions, rather than the employee's subjective preference, alone, is an insufficient basis for finding an adverse employment action."); Serna, 244 F.3d at 483 ("[I]t is insufficient for a plaintiff to show merely that he has been transferred from a job he likes to one he considers less desirable. Rather, a plaintiff must produce enough evidence to allow a reasonable trier of fact to conclude that, when viewed objectively, the transfer caused [him] harm . . . .").

Defendant sets forth evidence to show that Plaintiff's 2011 reassignment was a lateral move within the Fire Marshal's Office and that there was no loss in rank or position within the Office. (Mot. at 11.) According to Chief Hood, every position at the rank of District/Division Chief is of equal importance to

26

the operation of SAFD.  (Id. at 15 (citing Hood Aff. at 1).)  Defendant explains that the reassignment was common practice in the Fire Marshal's Office and was within Asst. Chief Crayton's authority to use his staff in a manner to best fulfill the duties of the Fire Marshal's Office.  (Id. at 3 (citing Crayton Dep. 32:15–20).)  Indeed, the duties and requisite positions within the Fire Marshal's Office changed frequently. In 2008, Plaintiff handled Community Safety and Education, while Villareal supervised Arson, Special Events, Inspections and Administration.  (Jenkins Dep. 97:24–98:3.)  When Villareal transferred out of the Fire Marshal's Office, Plaintiff took over all duties for a short period of time.  (Id. 98:18–25.)  Then in late 2008 or early 2009, Perez was assigned to the Fire Marshal's Office and placed in charge of Community Safety and Education, while Plaintiff was in charge of Special Events, Inspections, and Administration.[5]  (Id. 100:25–101:12, 101:8–10, 103:15–18.)  In late 2010 after Perez had left, Monestier was assigned to the Fire Marshal's Office and placed in charge of Community Safety and Education.  (Id. 107:11–22.)  And then in February 2011, Monestier assumed the responsibilities of Inspections and Plaintiff was assigned to Community Safety and Education.  (Crayton Dep. 20:10–23:5.)

　　　　　In response, Plaintiff maintains that the transfer from Inspections and

---

[5] Plaintiff did not file an EEOC Complaint when Asst. Chief Crayton reassigned Plaintiff's duties in late 2008 or early 2009, despite Asst. Chief Crayton reassigning several of Plaintiff's earlier responsibilities.

Administration to Community Safety and Education constituted a "demotion" because it resulted in (1) a loss of prestige, (2) a loss of responsibilities, (3) loss of overtime opportunities, and (4) a reduction of opportunities for promotion or appointment to positions of higher responsibility. (Resp. at 7.)

### 1. Loss of Prestige

Defendant contends that Plaintiff cannot proffer any material evidence to show that the Community Safety and Education position is less prestigious than Inspections because Plaintiff's role in Community Safety and Education is vital to the San Antonio Fire Department:

> The three goals of the SAFD are to save lives through emergency response, fire prevention and community involvement. Jenkins is largely responsible for community involvement. In that position, he is the face of the department when he interacts with community and business leaders to promote fire safety.

(Mot. at 12 (citing Hood Aff. at 1).)

To support his theory that the transfer constituted a loss of prestige, in a one sentence response, Plaintiff directs the Court to three portions of his deposition testimony wherein he stated:

> [Plaintiff]: Other staff members have said to me -- and I don't recall exactly who, but yes, they feel that there's a big difference between being over -- over community safety and education and being over inspections. Inspection is the -- inspection is the prime event, the prime area of the fire marshall's office. That's where you go meet with business owners, leaders in the community to discuss major, major projects. None of that happens in community safety and education.

28

The biggest thing in community safety and education is, like I said, Sparky appearances, demos and school stuff.  So it's a demotion in prestige.  It's a demotion in decisions that you get to make and the people you make contact with, yes.

[Counsel for Defendant]:  My question was: Who told you it was a demotion?

[Plaintiff]: There are some people in the office, and I can't recall exactly who when -- who exactly, but there are people in the office who have mentioned that there's a big difference in the job, and that community safety and education is not viewed on the same level as inspections, that it's a demotion.

. . . .

[Counsel for Defendant]: Has anybody ever told you that your position in community safety and education is less prestigious than other division chief positions?

[Plaintiff]: People have told me that the position of community safety and education is less prestigious, yes.  Exactly who, I can't recall at this time, but I've had -- people have told me particularly after the move that it is.  I believe Captain Westbrook[6] has even told me that the fire chief told him anybody can do his job.

[Counsel for Defendant]: Well, that you would agree with me, was hearsay from the chief to Captain Westbrook to you, then, correct?

[Plaintiff]: That was hearsay from chief to Captain Westbrook, but it shows the perspective on what the department thinks about community safety and education.

. . . .

[Counsel for Defendant]: Has anybody ever told you that you were

---

[6] Captain Westbrook is one of Plaintiff's subordinates who designed programs to obtain funding for community projects.  (Jenkins Dep. 138:14–20.)

demoted from the City based upon the shifting of positions between you and Chief Monestier?

[Plaintiff]: The word "demotion" wasn't used as far as demotion in rank, but demotion in responsibility, yes.  I was told demotion in responsibility and authority and prestige and importance, yes, I was told that.  Well not, prestige.  Importance.  I was told that that was a form of demotion in those areas.

[Counsel for Defendant]: And that was told to you by whom?

[Plaintiff]: I don't know -- I can't recall exactly at this time.  I know Lieutenant Parsons had discussed this with me before.  I think Captain Westbrook also may have mentioned that before to me as well.

(Resp. at 7 (referencing Jenkins Dep. 133:1–22, 138:21–139:10, 198:24–199:12)[7].)

Defendant objects to the first and third portions of Plaintiff's deposition testimony, asserting that both portions are vague and ambiguous, contain hearsay, and "by Jenkins' own admission," there may be tape recordings of the alleged exchanges and such recordings[8] that would be the best evidence of what was

---

[7] The Court only relies on evidence cited by Plaintiff in his Response.  See Ragas v. Tenn. Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998) ("The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim.  Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." (internal quotation and citations omitted)).

[8] Defendant requests recordings because Plaintiff admitted to regularly recording City of San Antonio staff members without their knowledge during their conversations with Plaintiff and making notes on such recordings on his personal computer.  (Jenkins Dep. 10–15.)  Plaintiff admitted to having over 100 recordings of individuals, including but not limited to: Chief Hood, Chief Martinez, Asst. Chief

actually said.  (Dkt. # 42 at 2.)  Although Plaintiff did not respond to Defendant's objections and Defendant's objections lack specific legal argument, the Court has examined Defendant's objections and finds that they are without merit.

First, although Plaintiff's testimony easily could have been clearer, he did affirmatively state that other staff members considered his position a demotion, so Defendant's vagueness challenge is insufficient to render Plaintiff's testimony inadmissible for consideration on a motion for summary judgment.

Second, while it is well-settled that a party may not rely on inadmissible hearsay in opposing a motion for summary judgment, see Warfield v. Byron, 436 F.3d 551, 559 (5th Cir. 2006) (noting that hearsay evidence is inadmissible for summary judgment purposes under Federal Rule of Civil Procedure 56), Defendant's hearsay challenge fails because the statements referred to by Plaintiff are not hearsay.  Rather, they are admissions by a party-opponent.  See Fed. R. Evid. 801(d)(2) (stating that admissions by a party-opponent are not hearsay if "[t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship").  Any statements made by SAFD staff members, including Lieutenant Parsons and Captain Westbrook, concerning the

---

Crayton, Deputy Chief Noel Horan, Captain Westbrook, Division Chief Matt Jiminez, Lieutenant Andy Amazon, Division Chief Christopher Steel.  (Id. 14:3–4, 15:12–20.)

evaluation of the Community Safety and Education position would have been within the scope of the staff members' employment with SAFD[9] and made during the existence of the employment with SAFD as well, and therefore qualify as admissions by a party opponent under Rule 801(d)(2).

Third, Defendant's "best evidence" objection misses the mark because Plaintiff's testimony does not seek to prove the content of a recording.  See Fed. R. Evid. 1002; United States v. Chaney, 299 F. App'x 447, 455 (5th Cir. 2008) ("The best evidence rule states that, '[i]n proving the content of a writing, recording or photograph, where the terms of the content are material to the case, the original document must be produced unless it is shown to be unavailable for some reason other than the serious fault of the proponent, or unless secondary evidence is otherwise permitted by rule or statute.'" (quoting Kenneth S. Broun et al., McCormick on Evidence 87 (6th ed. 2006))).  "[T]he best evidence rule comes into play only when the terms of a writing are being established, not when a witness's

---

[9] There may be an argument that the statements do not qualify as admissions by party-opponents because the statements concern matters not related to the declarant's specific duties with SAFD.  See Kelly ex rel. all Heirs at Law of Kelly v. Labouisse, CIV.A.3:07CV631TSLJC, 2009 WL 427103, at *6 n.4 (S.D. Miss. Feb. 19, 2009) aff'd sub nom. Kelly v. Labouisse, 364 F. App'x 895 (5th Cir. 2010) (holding that a statement of an employee did not qualify as an admission by a party opponent because "the subject matter of [the] statement simply d[id] not 'match' the duties of his employment").  However, the Court finds that the employees' general remarks concerning other positions within SAFD is still within their scope of employment with SAFD because the remarks were related to their employment with SAFD.

testimony is based on personal knowledge." Kiva Kitchen & Bath v. Capital

Distrib., Inc., 319 F. App'x 316, 322 (5th Cir. 2009); see also Zimmerman v. Gruma

Corp., 3:11-CV-01990-L, 2013 WL 3154118, at *8 (N.D. Tex. June 21, 2013)

(overruling a best evidence objection because the declaration suggested that the

witness was speaking based on firsthand knowledge of an employee who

complained about a letter, as opposed to knowledge gained from a writing depicting

the event).  In this case, Plaintiff's deposition testimony averred that other staff

members told him their impression of the Community Safety and Education

position.  Plaintiff did not learn of the other staff members' impressions from his

recordings; he learned them first hand, so the best evidence rule does not apply.

   At any rate, Plaintiff's statements are insufficient to create an issue of

material fact that his reassignment to Community Safety and Education was "less

prestigious."  Plaintiff only offered his statement that Donna Parsons had once told

him she found Community Safety and Education "less important."  Plaintiff

additionally relied on conclusory allegations that "people" and "other staff

members" have generally told him—though he could not point to a particular

instance—that they considered Community Safety and Education less important or

less prestigious.  Plaintiff's conclusory evidence regarding the alleged decrease in

prestige fails to show a pervasive impression in the Fire Marshal's Office that

Community Safety and Education was objectively less prestigious.  And, "[i]t goes

without saying that such conclusory, unsupported assertions are insufficient to defeat a motion for summary judgment." Marshall on Behalf of Marshall v. E. Carroll Parish Hosp. Serv. Dist., 134 F.3d 319, 324 (5th Cir. 1998) (citing Clark v. America's Favorite Chicken Co., 110 F.3d 295, 297 (5th Cir. 1997) ("Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment." ).

Perhaps more importantly, Plaintiff did not cite any reason for these generalized statements from Parsons, "people," and other "staff members" that Community Safety and Education was less important or prestigious.  See Duffy v. Leading Edge Prods., Inc., 44 F.3d 308, 312 (5th Cir. 1995) ("[C]onclusory allegations unsupported by concrete and particular facts will not prevent an award of summary judgment . . . ."); Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1449 (5th Cir. 1993) (considering summary judgment appropriate if the "nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation").  Without any reason for these generalized statements, Plaintiff has not tendered sufficient evidence to create a genuine issue of material fact showing that the duties assigned to Community Safety and Education position were objectively less prestigious than the duties that corresponded to Inspections.  See Alvarado, 492 F.3d at 613–14 (reminding that whether the new position is sufficiently worse

34

enough to amount to a de facto demotion is an "objective inquiry").

In <u>Click v. Copeland</u>, wherein the Fifth Circuit held that the transfers of two deputy sheriffs from the law enforcement division to positions as jail guards could be considered demotions, the court relied primarily on the fact that Plaintiff produced evidence that "everybody" viewed a transfer from detention to law enforcement as a promotion and there was a general preference for law enforcement positions, as "all" jail guards would like to be doing law enforcement work.  970 F.2d 106, 109 (5th Cir. 1992).  Unlike in <u>Click</u>, Plaintiff fails to show that the duties associated with the Community Safety and Education position is somehow beneath the duties assigned to the Inspections position or that SAFD staff members would like to be doing Inspections, as opposed to Community Safety and Education.  Both positions are in the same office in the Fire Marshal's Office and involve the same amount of base pay and incentive pay.  In fact, although Plaintiff espoused that the Inspections position was more prestigious because it involves interacting with business owners and leaders in the community (Jenkins Dep. 133:1–7), Chief Hood explained that the position of Community Safety and Education is primarily responsible for interacting with those same people (Hood Aff. at 1 ("In that position, [Plaintiff] is the face of the department when he interacts with community and business leaders to promote fire safety.")).

In effect, Plaintiff was merely assigned <u>different</u> duties within the Fire

Marshal's Office—not necessarily less prestigious duties.  Even Monestier, the individual who was reassigned to Inspections, had previously been assigned to work the Community Safety and Education position.  And Plaintiff had previously overseen Community Safety and Education on two previous occasions.  It was within Asst. Chief Crayton's discretion to allocate staffing responsibilities within the Fire Marshal's Office to utilize each District/Division Chief's talents (and weaknesses) and equally divide up work depending on the needs at the time.  (Crayton Aff. at 1 ("During my tenure in this position, I have realigned job duties amongst my subordinates on many occasions, based on department needs and abilities of the persons working for me.").)

Even Plaintiff admits that some employees even preferred to work in the Community Safety and Education section, rather than Inspections: "Captain Westbrook voluntarily went to community safety and education because of what he felt was a hostile environment in inspections.  And so he voluntarily for the peace of the division went to community safety and education."  (Jenkins Dep. 163:25–164:4.)

At best, Plaintiff attempts to defeat summary judgment by his subjective impression that Community Safety and Education is "less prestigious" or that that work is less interesting, but "a plaintiff's subjective perception that a demotion has occurred is not enough."  Forsyth, 91 F.3d at 774; see also Hunt, 277

36

F.3d at 771 n.8 ("[T]he focus is on the <u>objective</u> qualities of the positions, rather

than an employee's subjective preference for one position over another.  That

subjective preference, alone, is an insufficient basis for finding an adverse

employment action." (emphasis added)); <u>Serna</u>, 244 F.3d at 483 ("[I]t is insufficient

for a plaintiff to show merely that he has been transferred from a job he likes to one

he considers less desirable.  Rather, a plaintiff must produce enough evidence to

allow a reasonable trier of fact to conclude that, when viewed objectively, the

transfer caused [him] harm . . . .").  Plaintiff has not tendered evidence to create an

issue of material fact that the 2011 reassignment was sufficiently less prestigious to

constitute an adverse employment action.

### 2.    Loss of Responsibilities

Plaintiff next contends that the transfer to Community Safety and

Education resulted in a loss of responsibilities because he used to supervise twelve

regularly assigned staff members and now supervises only two regularly assigned

staff members and six to eight light-duty employees.  (Resp. at 7 (citing Jenkins

Dep. 92).)  Defendant argues that even if the Inspections position supervised twelve

people, the fact that Plaintiff was responsible for anywhere from eight to ten people

does not demonstrate that he was subject to an adverse personnel action.  (Reply at

3–5.)

Although the Fifth Circuit has never affirmatively stated that the loss of

37

responsibility is the equivalent of a demotion for adverse-employment-action purposes, the Alvarado court cited Hinson v. Clinch County, Georgia Board of Education, 231 F.3d 821, 829 (11th Cir. 2000) to state: "In a Title VII case, a transfer to a different position can be 'adverse' if it involves a reduction in pay, prestige, or responsibility." Alvarado, 492 F.3d at 613 (quoting Hinson, 231 F.3d at 829).

In Kidd v. Mando American Corp., the Eleventh Circuit noted that because the plaintiff suffered neither a decrease in pay nor a loss of title—but only a loss of supervisory responsibilities, she needed to show that her case was one of those "unusual circumstances" where the change in responsibilities was "so substantial and material that it altered the 'terms conditions, or privileges' of her employment." 731 F.3d 1196, 1203 (11th Cir. 2013) (quoting Davis v. Town of Lake Park, Fl., 245 F.3d 1232, 1245 (11th Cir. 2001)).  There, a plaintiff had been appointed to temporarily manage the accounts payable department, which meant that the plaintiff supervised the two accounts payable clerks, approved invoices, and handled wire payments.  Id. at 1203.  When another individual, Seo, became the assistant accounting manager, the plaintiff slowly began to lose her supervisory responsibilities.  Id.  The court found that the plaintiff's assertion of a loss of supervisory responsibility was insufficient to constitute an adverse employment action:

38

> Because [the plaintiff's] demotion claim is grounded on a loss of supervisory responsibility, it is one our circuit does not favor.  Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities.  And it is by now axiomatic that Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions.

Id. at 1203–04 (internal quotation marks and citations omitted).

In this case, the change in supervisory responsibilities is too minimal to constitute a de facto demotion sufficient to be deemed an adverse employment action.  Plaintiff went from supervising ten to twelve regularly assigned staff members to two regularly assigned staff members and between six to eight light-duty employees.  While the number of regularly-assigned personnel Plaintiff supervised did decrease[10], Plaintiff has not shown the de minimus change in number of personnel has significantly altered the terms of his employment such that it resulted in a loss of responsibilities sufficient to constitute a de facto demotion.

3.     Loss of Overtime

Defendant argues that Plaintiff's allegation of lost overtime opportunities lacks merit.  (Mot. at 12–13.)  Defendant proffers that Plaintiff did not lose overtime opportunities because of his reassignment to Community Safety and

---

[10] However, the total number of employees supervised does not appear to have changed.  Plaintiff went from supervising ten to twelve employees to supervising eight to ten.

Education; in fact, he gained opportunities because of the reassignment:

> While overseeing inspections, Jenkins was eligible for any overtime assignment in Fire Prevention, except those specifically reserved for CS&E members. Shortly after the realignment, the sworn members of the Fire Prevention Office voted to allow CS&E sworn members to be eligible for all overtime opportunities. The overtime opportunities specifically reserved for CS&E members remained reserved only for those assigned to CS&E duties. When Jenkins' duties were realigned and he was charged with supervising CS&E, he remained eligible to receive all overtime opportunities he previously had. The only change that Jenkins experienced in relation to overtime opportunities after the realignment was that he also became eligible to receive overtime opportunities only reserved for CS&E staff members.

(Mot. at 12–13 (citing "Monestier Aff.," Dkt. # 29, Ex. I).)

Again, in a one sentence response, Plaintiff cites the following passage from his deposition to contend that whether he lost overtime opportunities is an issue of material fact:

> [Counsel for Defendant]: Okay. How much overtime opportunities have you been denied the opportunity to work?
>
> [Plaintiff]: I don't have that information at this time, and I believe I said that in my interrogatories response.
>
> [Counsel for Defendant]: Well, on what day did you want to work an overtime opportunity or an opportunity for overtime and you were denied the opportunity to do that?
>
> [Plaintiff]: I can't make that -- I can't provide that information at this time.
>
> . . . .
>
> [Counsel for Defendant]: Well, then what day did you think there was overtime available and you wanted to work, but you were not allowed

to work?

[Plaintiff]: I can't say that, sir, at this time.  I don't know that information at this time.

[Counsel for Defendant]: Well, how did you come to the calculation of $10,000?

[Plaintiff]: Because when I looked at one year to the next, 2010 versus 2011, the same year that the vote was taken, there was a decrease in my yearly income of approximately $10,000.  Keeping in mind that I had also received two pay raises of nearly five percent, which means my base pay went up as well as my overtime rate went up, but yet I lost nearly $10,000 income.  And the only way that could occur is lost overtime opportunities, decreased overtime opportunities.

[Counsel for Defendant]: So, sir, you're saying that -- just because your pay went down from one year to the next, you're saying that was totally caused by loss of overtime opportunities?

[Plaintiff]: My base pay -- yes.  My incentive pays are -- always the same.  And my base pay rose something in the area of about $5,000, $6,000 from one year to the next because I received, like I said, five maybe six percent pay raise increase in 2010 and 2011, yet my pay went down.

. . . .

[Counsel for Defendant]: So you're saying that you didn't work as many overtime shifts.  Is that what you're saying?

[Plaintiff]: I'm saying I did not work as many overtime opportunities.

[Counsel for Defendant]: Okay.  Well, wouldn't you agree with me that you would have been able to ascertain the number of opportunities you had, and then the number of opportunities you actually took to figure out what the difference is; is that correct?

[Plaintiff]: That is correct.

[Counsel for Defendant]: Okay.  Well, and my question to you is: When you were denied an opportunity to work overtime in 2011 or

41

2012 and therefore that caused you a loss of money?

[Plaintiff]: I don't have the records at this time, so I can't say what particular dates.

[Counsel for Defendant]: What record would show that?

[Plaintiff]: Records that I'm sure -- that are probably kept by the special events office.

. . . .

[Counsel for Defendant]: Have you ever approached them and asked them to look at those records?

[Plaintiff]: I have not.

[Counsel for Defendant]: Okay.  Well, isn't it true, sir, that overtime opportunities, your name is on a list; isn't that correct?

[Plaintiff]: Yes, it is.

[Counsel for Defendant]: Okay.  And you'd agree with me, sir, that in 2010 and 2011 your name was always on the list for special events.

[Plaintiff]: My name is always on the list, yes.

[Counsel for Defendant]: For overtime?

[Plaintiff]: For overtime, yes.

[Counsel for Defendant]: And they go down the list and they pick the next person that's up and they give them the opportunity to work, and if they don't want to work it, they ask the next person; is that correct?  Is that how it works?

[Plaintiff]: That's how it should work.

[Counsel for Defendant]: Okay.  Well, your name was on the list work special events overtime in 2010 and 2011, wasn't it?

[Plaintiff]: Yes, it was.

. . . .

[Counsel for Defendant]: My question to you was: Are you saying if your name was on that list to work an overtime opportunity that somebody intentionally skipped your name to deny you that opportunity?

[Plaintiff]: I believe that could have occurred.

[Counsel for Defendant]: Okay.  And who are you accusing of doing that.

[Plaintiff]: I'm not accusing anyone at this time.  I'm just saying that it could have occurred.  It appeared to have occurred that Captain Richard Hernandez and Lieutenant Cabello could have passed me up without offering me overtime opportunities and I would not have known when that occurrence happened.

[Counsel for Defendant]: Did you ever ask any of those two lower ranking officers if they skipped you over?

[Plaintiff]: I think I may have made a comment to them like that before.

[Counsel for Defendant]: And what did they say?

[Plaintiff]: They said no.

(Jenkins Dep. 51:6–15, 51:23–52:23, 53:11–54:3, 54:8–55:3, 55:14–56:6.)

Even crediting Plaintiff's recitation of his overtime issues, Plaintiff's citations to his deposition testimony do not create an issue of material fact regarding the loss of overtime opportunities.  His overtime theory is wholly speculative; his own testimony reveals that he "believe[s] that could have occurred" and he's "not accusing anyone at this time."  (Id. 55:18, 55:20.)  Additionally, his theory relies on strikingly flawed logic.  For example, Plaintiff does not state that he never declined overtime opportunities, for if he did decline overtime opportunities, that fact could

have explained some or all of the alleged $10,000 income disparity.  Similarly,

although Plaintiff agreed that SAFD's overtime framework included a list of those

eligible for overtime and that lower ranking members of the Fire Marshal's Office

would "go down the list and give them an opportunity to work," he neglects to

mention whether in 2011 there were more or less employees eligible for overtime,

another factor which would easily explain the alleged income disparity.  And even if

Plaintiff's theory held water, Plaintiff has not proffered any evidence to show that

his alleged loss of overtime opportunities can be attributed to his transfer to

Community Safety and Education, which is the relevant consideration in

determining whether the loss of overtime opportunities <u>because of</u> his reassignment

to Community Safety and Education was a demotion, and therefore an adverse

employment action.

### 4.   Reduction in Promotion Potential

Defendant argues that Plaintiff's accusations of his promotional

potential because of his transfer to Community Safety and Education is nothing

more than Plaintiff's speculation.  (Reply at 4–5.)  Defendant is correct; Plaintiff's

deposition testimony contains only his own impression that he was less likely to be

considered for a position of higher responsibility as a result of the 2011

reassignment.  (Jenkins Dep. 75–76.)   The only statement Plaintiff provides to

support his theory is a statement from Asst. Chief Crayton, wherein he told Plaintiff

44

he was not being considered for assistant chief by Chief Hood.  (Id. 76:12–13.)

However, Plaintiff offers no evidence to show that his lack of consideration was

attributed to his reassignment to Community Safety and Education—the relevant

inquiry.  Moreover, his own testimony admits that he never sought a promotion to

the rank of Assistant Chief while Chief Hood has been in charge.  (Jenkins Dep.

62:9–17.)

    Plaintiff additionally argues that "[a]s an example of how much more

quickly a Chief of Inspections can be transferred to a higher position, on December

6, 2011, Chief Monestier was named the Deputy Fire Marshall, a position never

offered to Plaintiff."  (Resp. at 7.)  Again, however, Plaintiff's accusation is

premised on his subjective belief that being in charge of Inspections—as opposed to

Community Safety and Education—resulted in Monestier's "promotion."

Furthermore, Plaintiff neglects to mention that Monestier had been in charge of

Community Safety and Education earlier in 2010.  Alas, Plaintiff does not offer any

evidence, other than his own personal perceptions, to demonstrate that the

Community Safety and Education position objectively has less promotion potential.

    Accordingly, Defendant is entitled to summary judgment on Plaintiff's

race and age discriminations because Plaintiff cannot show that the 2011

reassignment constituted an adverse employment action and therefore cannot state a

prima facie case.

C.   <u>Plaintiff Cannot State a Prima Facie Case for his Retaliation Claim Based on his 2011 Reassignment.</u>

Again, even though Plaintiff's retaliation claim for the 2011 reassignment is barred due to untimely filing, even assuming Plaintiff timely filed, Defendant is still entitled to summary judgment.  Here, Plaintiff claims that he provided a statement on behalf of another SAFD staff member, Angela Walker ("Walker"), who had complained against Asst. Chief Crayton in 2009 for calling her "baby girl" and that Plaintiff's statement led to his 2011 reassignment.  (FAC ¶ 8.)  However, Plaintiff cannot state a prima facie case for retaliation regarding the 2011 reassignment.

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) the employee engaged in an activity protected by Title VII; (2) the employer took adverse action against the employee; (3) a causal connection exists between the protected activity and the adverse employment action.  <u>Aryain v. Wal-Mart Stores Tex., L.P.</u>, 534 F.3d 473, 484 (5th Cir. 2008).  Unlike the adverse employment action inquiry for a Title VII, in order for a personnel action to be adverse in a retaliation case, the plaintiff only must show that a reasonable employee would have found the challenged action materially adverse—it need not be an employment decision like the standard for a substantive discrimination offense.

46

<u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68–69 (2006).[11]  The

question is whether the action is one that would dissuade a reasonable worker from

making or supporting a charge of discrimination under Title VII.  <u>Id.</u> at 68.

(referring "to reactions of a reasonable employee" because the Court believed that

"the provisions standard for judging harm must be objective"). The act must subject

the plaintiff to material adversity and not be one of trivial harm.  <u>Id.</u>

   As with age and race discrimination, once the plaintiff makes a prima

facie showing, the burden of production shifts to the defendant to produce a

legitimate business reason, and then back to the employee to show pretext.  <u>Id.</u>  An

employee establishes pretext by showing that the adverse personnel action would

---

[11] The <u>Burlington Northern</u> Court distinguished between the relevant test for an
employer's actions in substantive discrimination cases and retaliation cases based on
the difference in the statutory language for the two provisions.  548 U.S. at 62 ("The
italicized words in the substantive provision—'hire,' 'discharge,' 'compensation,
terms, conditions, or privileges of employment,' 'employment opportunities,' and
'status as an employee'—explicitly  limit the scope of that provision to actions that
affect employment or alter the conditions of the workplace.  No such limiting words
appear in the antiretaliation provision."); <u>see also id.</u> at 63 ("There is strong reason
to believe that Congress intended the differences that its language suggests, for the
two provisions differ not only in language but in purpose as well. The
antidiscrimination provision seeks a workplace where individuals are not
discriminated against because of their racial, ethnic, religious, or gender-based
status.  The antiretaliation provision seeks to secure that primary objective by
preventing an employer from interfering (through retaliation) with an employee's
efforts to secure or advance enforcement of the Act's basic guarantees.  The
substantive provision seeks to prevent injury to individuals based on who they are,
i.e., their status.  The antiretaliation provision seeks to prevent harm to individuals
based on what they do, i.e., their conduct.").

not have occurred "but for" the employer's retaliatory reason for the action.  Univ of Tex. Southwestern Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013).  In order to avoid summary judgment, the plaintiff must show a conflict in substantial evidence on the question of whether the employer would not have taken the action "but for" the protected activity.  Long v. Eastfield Coll., 88 F.3d 300, 308 (5th Cir. 1996).

Defendant argues that Plaintiff does not have sufficient evidence to satisfy the second and third elements of a prima facie case for retaliation, namely that Plaintiff did not suffer a "materially adverse" employment action and he cannot show a causal connection between the protected activity and the adverse employment act.  (Mot. at 21–25.)

1.     The 2011 Reassignment Was Not a Materially Adverse Employment Action.

Plaintiff does not cite to any particular evidence that he was subjected to a materially adverse employment action.  Instead, he states that "courts have held that in cases where a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing him from using his skills and experience, so that the skills are likely to atrophy, and his career is likely to be stunted, such transfers may be considered a 'materially adverse employment action.'"  (Resp. at 16 (citing Nicols v. S. Ill. Univ.-Edwardsville, 510 F.3d 772, 780 (7th Cir. 2007)).)  Given that Plaintiff does not cite any evidence in

48

this section, Plaintiff ostensibly relies on his deposition testimony from his adverse-employment-action argument.

Although <u>Burlington Northern</u> made the "materially adverse employment action" inquiry more contextual, <u>see</u> 548 U.S. at 68 ("[T]he significance of any given act of retaliation will often depend on the particular circumstances."), whether the 2011 reassignment constituted "materially adverse employment action" is still an objective inquiry, <u>see id.</u> (noting that the standard is objective), and Plaintiff has failed to set forth any evidence (other than his own subjective impression) that Community Safety and Education was appreciably less prestigious, involved less responsibility, had less overtime opportunities, or left less room for advancement.

Rather, Plaintiff's reassignment resembles the transfer in <u>Aryain</u>, 534 F.3d at 485. There, the Fifth Circuit considered whether the plaintiff's transfer from being a cashier in the Tire Lube Express Department ("TLE") department to a sales associate in the infant department constituted a "materially adverse employment action." <u>Id.</u> The court noted that the plaintiff's duties in the infant department were somewhat different than what she did in TLE, especially because the infant department involved less customer interaction. <u>Id.</u> However, the court held that any evidence that the infant department position was less arduous or less prestigious was attributed to the plaintiff's subjective preference. <u>Id.</u> The court concluded by

49

finding that Wal-Mart's act of transferring the plaintiff from TLE to the infant

department would not dissuade a reasonable employee in her circumstances from

making or supporting a discrimination charge.  Id.

       The logic behind Aryain is persuasive in the context of Plaintiff's

reassignment in 2011.  Plaintiff did not suffer a materially adverse employment

action that caused him harm.  Rather, Plaintiff was given a different set of tasks to

oversee within the Fire Marshal's Office commiserate with his strengths and

weaknesses.  Although Plaintiff's duties changed, there is insufficient evidence to

demonstrate that this change "might have dissuaded a reasonable worker from

making or supporting a charge of discrimination."  Burlington Northern, 548 U.S. at

68 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

Depending on a particular District/Division Chief's desires or skill set, it is

conceivable that a District/Division Chief would prefer to oversee Community

Safety and Education over Inspections.  Even Plaintiff admitted that Community

Safety and Education is an important responsibility, involving soliciting donations

from corporate sponsors.  (Jenkins Dep. 137:16–20.)  Indeed, Plaintiff took over

Community Safety and Education duties on two previous occasions prior to the

2011 reassignment.  (Id. at 93–98).  Moreover, as Defendant points out, Plaintiff's

role in Community Safety and Education is vital to SAFD because he serves as the

face of SAFD when he interacts with community and business leaders to promote

50

fire safety.

        2.      <u>There is no Causal Connection Between the 2009 Complaint and the 2011 Reassignment.</u>

Defendant posits that even if the 2011 reassignment was somehow a materially adverse employment action, Plaintiff cannot show that his participation in Walker's EEO complaint was causally connected. (Mot. at 25.) Plaintiff contends that he has "direct evidence" of the causal connection between Asst. Chief Crayton's retaliatory motives. (Resp. at 17.) According to Plaintiff, Asst. Chief Crayton "told him sometime in 2009 or 2010 'I know what you did. I know I've seen the report. I know you testified against me in Angela Walker's case. I can't believe another brother would turn on another brother'" and that "almost a year or two later" Asst. Chief Crayton told him, "'Now you see what it's like for a brother to turn on another brother.'" (<u>Id.</u> at 18 (citing Jenkins Dep. 116–17).)

First and foremost, this is not direct evidence. "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." <u>Sandstad v. CB Richard Ellis, Inc.</u>, 309 F.3d 893, 897 (5th Cir. 2002). "[F]or comments in the workplace to provide sufficient evidence of discrimination, they must be (1) related [to the protected class of persons of which the plaintiff is a member]; (2) proximate in time to the terminations; (3) made by an individual with authority over the employment decision at issue; and (4) <u>related to</u>

the employment decision at issue." Auguster v. Vermilion Parish Sch. Bd., 249

F.3d 400, 405 (5th Cir. 2001) (internal quotation marks and citations omitted)

(emphasis added).  In this case, there is no evidence that Asst. Chief Crayton made

these comments in reference to the 2011 reassignment, the employment decision at

issue.  In fact, Plaintiff conceded that he had no evidence that Asst. Chief Crayton

told him his duties were being reassigned to oversee Community Safety and

Education because of Plaintiff's participation in the Walker investigation:

> [Counsel for Defendant]:  That wasn't my question, sir.  My question
> was: Do you have any evidence that Chief Crayton made the decision
> to move you from inspections and administration to community safety
> and education and swap your position with Chief Monestier because
> you had given testimony or made a complaint to the EEOC?
>
> [Plaintiff]: He didn't say that that's why he made the swap, but
> statements he made indicated that he was displeased with that -- no.
> No. No, I can't say that.

(Jenkins Dep. 115:16–24.)

Plaintiff also asserts that the temporal proximity between his

participation in Walker's EEO Complaint and the 2011 reassignment satisfies the

causal connection requirement.  Although Plaintiff does not state exactly when his

participation in Walker's investigation began, he admits that there was a "two-year

gap" between his involvement in Walker's EEO Complaint and his reassignment to

Community Safety and Education.  (Resp. at 19.)  This two-year gap is insufficient

to show a temporal proximately to establish a causal connection.  See Bell v. Bank

52

of America, 171 F. App'x 442, 444 (5th Cir. 2006) (seven-month lapse, by itself, did

not demonstrate a causal link); Myers v. Crestone Intern., LLC, 121 F. App'x 25, 28

(5th Cir. 2005) (three-month lapse, by itself, did not create causal link); Harvey v.

Stringer, 113 F. App'x 629, 631 (5th Cir .2004) (unpublished) (ten-month lapse, by

itself, did not create causal link); Raggs v. Miss. Power & Light Co., 278 F.3d 463,

471–72 (5th Cir. 2002) (five-month lapse, by itself, did not create a causal link).

  At the most, Plaintiff relies on Asst. Chief Crayton's repeated use of

the phrase, "brother turn on another brother," to establish a causal connection

between his participation in the Walker investigation and his 2011 reassignment.

(Resp. at 18 (citing Jenkins Dep. 116–17).)  But even assuming the veracity of such

statements, as the Court is required to do on a motion for summary judgment, the

phrase's similarity is too tenuous—especially considering the two-year gap—to

constitute a causal connection between Plaintiff's involvement in Walker's 2009

EEO claim and the 2011 reassignment.

  In sum, Defendant is entitled to summary judgment on Plaintiff's race

and age discrimination claims and as well Plaintiff's retaliation claim because

Plaintiff did not timely file within the ninety-day window.  However, even if

Plaintiff did timely file, he fails to state a prima facie case for his race and age

discrimination claims because the 2011 reassignment was not an adverse

employment action and was a mere lateral transfer.  Similarly, he fails to state a

prima facie case for retaliation because the 2011 reassignment was not a materially adverse employment action, nor was there a causal connection between Plaintiff's participation in Walker's EEO Complaint and the 2011 reassignment.

II.     2012 Selection Process

     A.     Plaintiff Cannot State a Prima Facie Case for the 2012 Selection Process for his Race and Age Discrimination Claims.

Much like the 2011 reassignment, Defendant argues that the 2012 selection process did not constitute an adverse employment action, and as such, Plaintiff fails to state a prima facie case for race and age discrimination.  (Mot. at 12, 15.)  Defendant also argues that in regards to Plaintiff's age discrimination claim, Plaintiff fails to state a prima facie case because Jiminez, the candidate selected after the 2012 selection process, is insignificantly younger than Plaintiff. (Id. at 20.)

     1.     The 2012 Selection Process Was Not an Adverse Employment Action.

At the outset, the Court notes that although SAFD established a three-person panel in 2012 to determine which District/Division Chief should supervise Inspections, Defendant has tendered ample evidence, which Plaintiff has not sufficiently rebutted, that even if Plaintiff had been selected for Inspections, this would not have been a "promotion"; rather, this would have been a lateral transfer within the Fire Marshal's Office.  However, as noted earlier, a "denial of a transfer

may be the objective equivalent of the denial of a promotion, and thus qualify as an adverse employment action, even if the new position would not have entailed an increase in pay or other tangible benefits; if the position sought was objectively better, then the failure to award the position to the plaintiff can constitute an adverse employment action." Alvarado, 492 F.3d at 605 (citing Sharp, 164 F.3d at 933). Determining whether the new position is objectively better involves an analysis of the same factors as whether a reassignment constitutes a de facto demotion (as discussed infra), including whether the position: "entails an increase in compensation or other tangible benefits; provides greater responsibility or better job duties; provides greater opportunities for career advancement; requires greater skill, education, or experience; is obtained through a complex competitive selection process; or is otherwise objectively more prestigious." Id. Again, "[t]his is an objective inquiry; neither the employee's subjective impressions as to the desirability of the new position nor the employee's idiosyncratic reasons for preferring the new position are sufficient to render the position a promotion." Id. (citing Pegram v. Honeywell, Inc., 361 F.3d 272, 283 (5th Cir. 2004)).

      Plaintiff's arguments[12] that the 2012 selection process constituted an

---

[12] Plaintiff does not argue that the 2012 selection process amounted to an effective denial of a promotion. (See Resp. at 10–11.) Instead, Plaintiff only argues that he was clearly more-qualified for the position than Jiminez, a factor that is relevant for a pretext analysis, but is premature in assessing whether Plaintiff has stated a prima

adverse employment action fail for the same reason that the arguments pertaining to the 2011 reassignment failed.  Plaintiff did not tender any evidence that it was well-known in SAFD that the Inspections duties were more prestigious than Community Safety and Education duties.  Plaintiff wanted the Inspections position more, but the denial of his preference is not an actionable adverse employment action. Employment discrimination laws are "not intended to be a vehicle for judicial second-guessing of employment decisions, nor [are they] intended to transform the courts into personnel managers."  Bienkowski v. Am. Airlines, Inc., 851 F.2d 1503, 1507–08 (5th Cir. 1988).

However, the Court especially notes that after the 2012 selection process, Plaintiff actually acquired more responsibility—a fact that militates against a finding of an adverse employment action.  In addition to his Community Safety and Education duties, Plaintiff was assigned supervision of Special Events, after-hours details, boarding homes, schools, hospitals, nursing homes, and congregate living.  (Crayton Aff. at 2).  He was also assigned supervision of all engineers in the Fire Marshal's Office.  (Id.)  As a result of this increased workload, Plaintiff supervised twelve regularly assigned staff members and two to seven light duty personnel.  (Id.)  These additional duties further demonstrate that the 2012 selection

---

facie case.  (Id.)  Nevertheless, the Court will assume that Plaintiff relies on his earlier arguments regarding the 2011 reassignment to show that the 2012 selection process amounted to an adverse employment action.

process was not an adverse employment decision.

2.      Plaintiff Cannot State an Age Discrimination Claim Because He Was Replaced by a Person Insignificantly Younger.

One of the elements of a prima facie age discrimination claim requires that Plaintiff prove that he was "replaced by a younger person—but not insignificantly so." Bumstead v. Jasper Cnty., 931 F. Supp. 1323 (E.D. Tex. 1996) (citing O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312–13 (1996)); Earle v. Aramark Corp., 247 F. App'x 519, 523 (5th Cir. 2007) ("Schula was only four years younger than Earle—an insignificant age difference that is not sufficient to support a prima facie case of age discrimination."). Here, Plaintiff was born on February 16, 1960; Jiminez was born on January 25, 1962—less than two years after Plaintiff. (Crayton Aff. at 2.) Since Jiminez was not significantly younger than Plaintiff when he was selected for the Inspections position after the 2012 selection process, Plaintiff has failed to state a prima facie case of age discrimination.

B.      Plaintiff Cannot State a Prima Facie Case for his Retaliation Claim Based on the 2012 Selection Process.

As noted above, to establish a prima facie case of retaliation under Title VII, Plaintiff must show that (1) he engaged in an activity protected by Title VII; (2) SAFD took adverse action against him; and (3) a causal connection exists between the protected activity and the adverse employment action. Aryain, 534 F.3d at 484.

57

Plaintiff appears to assert that his earlier EEOC filing regarding the 2011 reassignment precipitated retaliation in his denial of a transfer to the Inspections position during the 2012 selection process.  (FAC ¶¶ 7–8.)  Defendant again argues that Plaintiff cannot show either a "materially adverse" employment action or a causal connection between the 2012 selection process and his earlier EEOC complaint.  (Mot. at 11.)

      1.    The 2012 Selection Process Was Not a Materially Adverse Employment Action.

      For the same reasons that the 2011 reassignment did not amount to a "materially adverse" employment action, the 2012 selection process was not a "materially adverse" employment action.  Plaintiff was denied a transfer to a position that he desired and found more interesting.  See Serna, 244 F.3d at 483 ("[I]t is insufficient for a plaintiff to show merely that he has been transferred from a job he likes to one he considers less desirable.").  But, "[a] transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either.  Otherwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit."  Williams, 85 F.3d at 274.  Plaintiff presented no evidence that a transfer from supervising Community Safety and Education to Inspections would be "anything but a lateral transfer in terms of pay, promotional opportunities, working conditions, and

other objective factors." <u>Sabzevari v. Reliable Life Ins. Co.</u>, 264 F. App'x 392, 396

(5th Cir. 2008).

> 2. <u>There Is No Causal Connection Between Plaintiff's EEOC Filing</u>
> <u>Related to the 2011 Reassignment and His Denial of a Transfer</u>
> <u>in the 2012 Selection Process.</u>

With regard to his retaliation claim for the 2012 selection process,

Plaintiff argues that "Crayton [has] stated it was a 'known fact' around the

Department that Plaintiff liked to play the 'race card' and that he had filed EEO

complaints and grievances against many of the chiefs" and that "many of the chiefs

refused to sit on the [2012 selection] panel because of Plaintiff's EEOC activity, all

except Chief Horan."  (Resp. at 18–19 (citing Jenkins Dep. 77–80).)

There are several problems with Plaintiff's argument.  First, it is

irrelevant whether Asst. Chief Crayton felt like Plaintiff enjoyed playing the "race

card" because Asst. Chief Crayton was not involved in the 2012 selection process.

Rather, a panel of three individuals were selected that neither worked in the Fire

Marshal's Office nor were under the supervision of Asst. Chief Crayton.  (<u>See</u>

Crayton Dep. 73–75; Dkt. # 29, Exs. F, G, H.)  As Defendant explained, "Assistant

Chief Crayton did not receive the recommendation of the interview panel nor did he

have input in the selection of District Chief Jiminez.  Rather, the recommendation

for the selection of District Chief Jiminez was given to Chief Hood."  (Mot. at 4–5

(citing Crayton Dep. 85–86).)  Ultimately, Chief Hood was responsible for selecting

59

Jiminez for the position.  (Id.)

Second, Plaintiff's argument that "many of the chiefs" refused to sit on the panel fails to establish that the actual panel used for the 2012 selection process engaged in any kind of retaliatory conduct.  Plaintiff does not set forth any evidence that the panel members' decision to select Jiminez was based on Plaintiff's earlier EEOC filing, and as such, has not demonstrated a sufficient causal connection to establish a prima facie case.

In conclusion, Defendant is entitled to summary judgment on Plaintiff's race and age discrimination claims as well as his retaliation claim related to the 2012 selection process because for each of Plaintiff's claims, he fails to state a prima facie case.

<u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment (Dkt. # 29).

IT IS SO ORDERED.

DATED: San Antonio, Texas, April 17, 2014.

_____
David Alan Ezra
Senior United States Distict Judge

60